UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

CIVIL ACTION NO. 7:20-CV-00047-EBA

RICKY HURD,                                                                    PLAINTIFF,

V.                      **MEMORANDUM OPINION & ORDER**

WADE ADAMS and
UNKNOWN DEFENDANT(S),                                        DEFENDANTS.

*** *** *** ***

### I. BACKGROUND

On the night of April 6, 2019, Plaintiff Ricky Hurd's truck broke down on the side of the highway, forcing him to walk home.  [R. 47-1 at pg. 3].  Hurd alleges that, after walking for about a mile, a Toyota Camry pulled over beside him.  Hurd recognized the driver as a former high school classmate and acquaintance, Andy Oliver.  [*Id.*].  Oliver asked Hurd if he wanted a ride, and Hurd accepted the offer.  [*Id.*].  Shortly after getting into the vehicle, Oliver remarked to Hurd that there was a cop behind their vehicle.  Hurd alleges that he didn't think anything of the comment.  Then, blue lights came on.  Hurd thought that Oliver was about to pull over when the vehicle slowed, but Oliver "swirled around" and accelerated in the opposite direction, "running away from [the police]."  [*Id.* at pg. 4].

The police officer in pursuit of Oliver and Hurd was Kentucky State Trooper Chadd Daniels, who radioed dispatch about the chase and the Camry's dangerous maneuvers.  For instance, the Camry turned down a dead-end driveway, with Daniels following close behind.  The Camry "back[ed] up and drove parallel past the front" of Daniels' cruiser, side-swiped his driver-

side door, and continued to flee down KY-15.  At one point, Daniels reported that the Camry abruptly locked up his breaks "in an attempt to get him to rear end the Camry," perhaps "to harm him or disable his cruiser."  [*Id.* at pg. 11].  Later, on a steep curve, the Camry struck the passenger side of the cruiser, performed a U-turn in the parking lot of a business, and sped off in the opposite direction at an estimated speed of 70 miles per hour.  [*Id.*].

Responding to Daniels' radio report, KSP Trooper William Adams and Sergeant Derrick Sturgill deployed tire deflation devices, spike strips, at the intersection of KY-15 and KY-160. [*Id.*].  Even after the Camry crossed the strips and the tires burst, it continued to travel at speeds around 50 miles per hour.  Another KSP Trooper, Bobby Roberts, attempted a moving roadblock until he noticed oncoming traffic cresting over a hill.  [*Id.*].  Finally, Daniels then obtained Sergeant Sturgill's permission to conduct a PIT maneuver, which involved Daniels using his cruiser to physically stop the Camry by making contact with the Camry's rear passenger panel.  Daniels executed the maneuver and the Camry careened off to the side of the road, striking the guardrail passenger side first.

When Trooper Adams exited his cruiser on the scene of the crash, "there was a lot of screaming and commotion."  [R. 47-2 at pg. 5].  As he approached the Camry, he saw a side window explode and heard a loud popping noise.  He later learned that Trooper Daniels had "taken his flashlight and slung it and busted it through" the car window but, at the time, he thought the sound could have been a gunshot.  [*Id.*].  While the other troopers "struggle[ed]" to apprehend a non-cooperative Oliver on the driver's side of the car, Adams approached the passenger's side. [*Id.* at pg. 6].  He was the only officer on the scene to do so.  The windows were heavily tinted, and he could hear Sergeant Sturgill on the other side of the vehicle yelling, "tase him" repeatedly.

Adams used his flashlight to bust out the back windshield, the back passenger window, and then the front passenger window.  [*Id.* at pg. 7–8].  Hurd claims that when the front passenger

window shattered, he was struck in the head more than once.  [R. 47-1 at pg. 5].  Meanwhile, Adams commanded Hurd to get out of the car and put his hands up.  Hurd admitted later that he was "addled" and "groggy" after Adams broke out his window, but he did not recall hearing the instructions over all the other noise.  [R. 47-1 at pg. 20].  After a few seconds, Adams reached over the guardrail, through the car, and pulled Hurd through the window.  [R. 47-2 at pg. 9].  After getting Hurd out of the car, Adams stepped back, and they both tumbled over an embankment on the other side of the guardrail.  [*Id.*].

Once they were at the bottom of the hill, Adams attempted to handcuff Hurd.  To do so, Adams struck Hurd on the back to encourage him to give up his hands.  [*Id.* at pg. 11].  After Hurd was handcuffed,  Adams claims that he left Hurd lying prone while he returned to the Camry to assist the other troopers in apprehending the driver.  [*Id.*].  But Hurd claims he was hit or kicked on his sides, his back, and his head *after* he was handcuffed.

After Oliver was apprehended and the situation was under control, Hurd was transported to Whitesburg Appalachian Regional Hospital by ambulance.  The EMT treating Hurd noted that he asked, "[c]an I tell you something off the record?"  Then, the EMT noted that "[patient] stated that cops beat him in the head."  [47-2 at pg. 13].[1]  Hurd was treated for a cut to the head, a head fracture, and a possible fracture to the orbital socket.  [*Id.* at pg. 11].  At the hospital, Sergeant Sturgill interviewed Oliver, Hurd, and Hurd's treating physician.  [R. 46-15].  Ultimately, Hurd was not arrested.  Rather, Adams cited him for resisting arrest and menacing.  After receiving emergent treatment for his injuries, he left the hospital against medical advice.  *See* [R. 46-13].

## II. PROCEDURAL HISTORY

On April 4, 2020, Hurd filed a Complaint in Knott Circuit Court against Wade Adams and

---

[1] The EMT report was not filed into the record as an attachment to either pending motion but was presented to deponents as an exhibit in multiple depositions.

Unknown Defendants,[2] alleging counts of false imprisonment, malicious prosecution, and defamation *per se* under Kentucky law; and a violation of his constitutional right to be free from an unreasonable seizure by a government official in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983.  On April 9, 2020, Adams removed the action to this Court pursuant to 28 U.S.C. § 1331 because the Court has original jurisdiction over claims arising under 42 U.S.C. § 1983.

In their Rule 26(f) Joint Report, the parties advised the Court that they consented to the jurisdiction of a Federal Magistrate Judge for all further proceedings in this matter.  [R. 8]. Accordingly, the case was reassigned to the undersigned and a Scheduling Order was entered on May 20, 2020.  On November 10, 2020, Hurd moved the Court to stay civil proceedings in this matter, pending the outcome of pending criminal proceedings.  [R. 11].  Therein, Hurd advised the Court that his state law claims—particularly the malicious prosecution and defamation *per se* claims—were contingent upon the outcome of the criminal proceedings.  Adams did not file a Response to the motion, so the Court stayed all litigation in this action.  [R. 13].  On December 9, 2021, upon being notified that Hurd's criminal proceeding had concluded (almost a year later), the Court lifted the stay.

Although the February 27, 2022 deadline to join parties or amend the Complaint had long passed, Hurd moved to amend his Complaint on September 9, 2022.  [R. 39].  On November 16, 2022, Adams filed a Motion for Summary Judgment, claiming that Hurds' federal and state claims are barred by qualified immunity and, alternatively, that there is no genuine dispute of material fact as to either the federal or state claims and that he's entitled to summary judgment.  [R. 46].

The pending motions have been fully briefed and are ripe for review.

---

[2] As defined by Hurd's Complaint, the "Unknown Defendants" is "an individual or individuals who are employed by the Kentucky State Police and who assisted Defendant, Wade Adams, in the performance of his tortious actions." [R. 1-1 at pg. 3].

### III. MOTION TO AMEND THE COMPLAINT

The Court will first address Hurd's Motion to Amend the Complaint, as is required in this circuit when there is also a pending dispositive motion. *Gresh v. Waste Servs. of Am., Inc.*, 189 F. App'x 359, 360 (6th Cir. 2006) ("A district court abuses its discretion when it grants a motion for summary judgment without first ruling on a pending motion to file an amended complaint.").

Hurd seeks to add as a defendant Derrick Sturgill solely invoking Federal Rule of Civil Procedure 21. [R. 39]. Hurd argues an amendment is necessary because Adams "identified [Sturgill] for the first time as Ricky Hurd's assailant" on his July 22, 2022 deposition. [R. 39 at pg. 1]. During that deposition, when Hurd's counsel was questioning Adams about how Hurd could have possibly been injured after being handcuffed, he testified the following:

> **Q: And so it's not possible that anybody else would've hit Mr. Hurd?· Any other trooper or any other person?**
> A: Well, another Sergeant, Derek Sturgill did hit him, but it was— I had my back turned and I heard the thumping of— he was kicking him.
>
> **Q:  Kicking him in the side, kicking him in the head?**
> A: When I heard the noise,  . . . Detective Caudill says something along the nature of, "Oh, no," or something of that nature.· Because he's looking over his ·shoulder.· So I look over my shoulder.· And at that time, I see Sergeant Sturgill kick Ricky in the side, which rolled him up on the side, he kicked him so hard. ·And then he kicked him and hit him in the face, with—or kicked him in the eye area.
>  . . .
> **Q:  So he kicked him in the side and kicked him in the head?**
> A: Face.· He kicked him in the face.
>  . . .
> **Q:  Is it possible that Officer Sturgill hit him in the head with a flashlight?**
> A:  It's possible.· Like I said, I had my back turned toward him.· I just heard him being hit like—like a boxer hitting a hay bay or something, you could hear a thud.

[R. 47-2 at pg. 11–12].

Notably, the Proposed Amended Complaint does not substitute Sturgill as a named defendant, nor amend any of the claims against Adams. The Proposed Amended Complaint adds

a § 1983 claim against Sturgill, alleging that he "assaulted and physically battered" Hurd "by repeatedly kicking" him in the "head, face, and torso" while Hurd was handcuffed and not resisting, [R. 39-2 at ¶ 33]; Kentucky common law claims of assault, battery, abuse of process, and malicious prosecution, [*Id.* at ¶¶ 41, 42]; and a claim that Sturgill fraudulently concealed his involvement in the action, thus tolling any statute of limitations under Ky. Rev. Stat. § 413.190(2), [*Id.* at ¶¶ 45–55].

Adams responded in opposition on several grounds: that the amendment is barred by the Court's Scheduling Order, that the amendment is barred by the statute of limitations, and that Hurd has not demonstrated good cause for the amendment.

**A. Statute of Limitations**

The Court will first address whether Hurd's proposed amendment is barred by the statute of limitations.  Hurd's state common law tort claims are governed by Kentucky's statute of limitation of one year for tort actions, Ky. Rev. Stat. § 413.140(1)(a).  As for Hurd's § 1983 claim, the Supreme Court has instructed courts to borrow the most analogous state law statute of limitations.  *Bonner v. Perry*, 564 F.3d 424, 430 (6th Cir. 2009) (citing *Owens v. Okure*, 488 U.S. 235, 236, 239, 109 S. Ct. 573, 102 L. Ed. 2d 594 (1989)).  Since "'§ 1983 claims are best characterized as personal injury actions,'[a] State's personal injury statute of limitations should be applied to all § 1983 claims."  *Owens*, 488 U.S. at 240–41 (quoting *Wilson v. Garcia*, 471 U.S. 261, 280, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1985)).  It is well-established in the Sixth Circuit that § 1983 claims arising in Kentucky are governed by Kentucky's statute of limitations for tort actions, Ky. Rev. Stat. § 413.140(1)(a).  *Bonner*, 564 F.3d at 430–31.  Thus, the statute of limitations for Hurd's proposed § 1983 claim against Sturgill is, too, one year as prescribed by § 413.140(1)(a).

Hurd's new claims arise out of the same incident described in his original Complaint.  Thus,

the statute of limitation for his claim expired on April 6, 2020, making his proposed amendment untimely.  Hurd argues that the statute of limitations for his claims should be tolled because he only learned of Sturgill's involvement in Hurd's alleged assault after taking Adams' deposition on July 22, 2022.  Specifically, Hurd relies upon Kentucky's fraudulent concealment statute, which provides that, when an individual "abscond[s] or conceal[s] himself or by any other indirect means obstructs the prosecution of the action, the time of the . . .  obstruction shall not be computed as any part of the period within which the action shall be commenced."  Ky. Rev. Stat. § 413.190(2).

To prove fraudulent concealment, Kentucky courts require that the plaintiff must show that an individual committed "some act or conduct which . . . misle[d] or deceive[d] plaintiff and obstruct[ed] or prevent[ed] him from instituting his suit while he [could] do so."  *Adams v. Ison*, 249 S.W.2d 791, 792 (Ky. 1952).  Ordinarily, courts require an affirmative act, but "where the law imposes a duty of disclosure, a failure of disclosure may constitute" fraudulent concealment.  *Munday v. Mayfair Diagnostic Lab.*, 831 S.W.2d 912, 915 (Ky. 1992).  However, "passivity, such as silence . . . , is not sufficient, in order to constitute such a concealment as to toll the statute of limitations."  *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 574 (Ky. 2009) (quoting 173 A.L.R. 576 5th § 12).  "Obstruction alone, without misleading or deceiving conduct, is not enough."  *Dishman v. Corr. Corp. of Am.*, Civil Action No. 10-CV-026-ART, 2010 U.S. Dist. LEXIS 86169, at *6 (E.D. Ky. Aug. 20, 2010) (citing *Labor Cabinet v. Hasken*, 265 S.W.3d 215, 227 (Ky. Ct. App. 2007)).

The plaintiff must also show that he was reasonably diligent in "uncover[ing] the sources of [his] injuries prior to the expiration of the statute of limitations[.]"  *Anderson v. Bd. of Educ.*, 616 F. Supp. 2d 662, 671 (E.D. Ky. 2009) (citing *United States v. Kubrick*, 444 U.S. 111, 117, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979)).  This is because a plaintiff has a "duty to exercise reasonable care and diligence to discover whether he has a viable legal claim."  *Estate of Wittich v. Flick*, 519

S.W.3d 774, 778 (Ky. 2017) (internal quotation marks omitted).  "[A]ny fact that should arouse his suspicion is equivalent to 'actual knowledge of his entire claim.'"  *Id.* (quoting *Hazel v. General Motors Corp.*, 863 F.Supp. 435, 439 (W.D. Ky. 1994)).

"[W]hen the fraud or concealment is revealed or the facts discovered or should have been discovered by the exercise of reasonable diligence" by the plaintiff, the statute of limitations begins to run.  *Adams*, 49 S.W.2d at 793.  In this case, Hurd avers that the one-year statute of limitations for his claims against Sturgill should be tolled from the date of his injuries, April 6, 2019, to the date he alleges he first received notice of Sturgill's involvement in the alleged assault, July 22, 2022—over three years.  As evidence of Sturgill's fraudulent concealment of his involvement in the events underlying this action, Hurd argues that even though he had a "conflict of interest[,]" Sturgill "conducted an internal affairs investigation for use of force against Ricky Hurd and cleared Wade Adams of wrongdoing."  [R. 39-1 at ¶ 50].  He also argues that Sturgill further involved himself in the post-incident investigation by interviewing Hurd and his doctor.  [*Id.* at ¶ 52].  He contends that Sturgill's use-of-force investigation "was calculated to conceal himself from" being sued by Hurd and, as a result, the results of the investigation "so tainted and corrupted [Hurd's] investigation that [he] could not have discovered his claims against Sturgill despite reasonable diligence."  [*Id.* at ¶¶ 54–55].

As alleged, Sturgill's conduct is not mere silence or failure to disclose, but affirmative acts to conceal his actions and involvement in the events underlying this lawsuit.  Certainly, Adams' allegations raised in his deposition are alarming.  But, at this juncture, the Court must determine whether Adams could have known, through reasonable diligence, of Sturgill's involvement before the statute of limitations expired.  Hurd has simply failed to demonstrate such diligence.

First, Hurd has not shown that he conducted an investigation, let alone a diligent one, into his claims prior to filing his lawsuit.  Specifically, he has not demonstrated that he made any

pre-suit efforts to determine the officers that could have been responsible for his alleged injuries. Notably, as well, Hurd did not commence the lawsuit until two days before the limitations period expired for his claims. As the Sixth Circuit reasoned when assessing the diligence of a plaintiff who filed a complaint two weeks before the expiration of the limitations period, "'[f]iling suit at or near the expiration of the statute of limitations period and then trying to determine the proper defendants does not constitute due diligence.'" *DeSpain v. Louisville Metro Gov't*, No. 21-6237, 2023 U.S. App. LEXIS 2274, at *12 (6th Cir. Jan. 27, 2023) (internal quotation marks omitted) (citing *Cross v. Carmona*, No. 15-14254, 2018 U.S. Dist. LEXIS 52866, 2018 WL 1535393, at *6–7 (E.D. Mich. Mar. 29, 2018)). Had Hurd filed his lawsuit sooner—"which he could have done because he clearly knew of his alleged injuries"—he may have been able to use the "discovery tools available to him" to ascertain Sturgill's alleged involvement in the events underlying his action before the statute of limitation for his claims expired. *DeSpain*, 2023 U.S. App. LEXIS 2274, at *12.[3]

Second, Hurd has not demonstrated that he was diligent after the initiation of the lawsuit. The Court recognizes that this action, including discovery, was stayed for nearly a year pending the resolution of Hurd's criminal proceedings that were directly related to the events on April 6, 2019. However, when the Court lifted the stay on December 9, 2021, Hurd's counsel waited until April 2022 to start *inquiring* about deposing Adams—the sole named defendant in this action. *See* [R. 29 at pg. 1] ("Counsel for the plaintiff reached out in April to schedule depositions of defendant, Wade Adams, and plaintiff, Ricky Hurd."). Then, due to reasons outside Hurd's control, Adams' deposition was scheduled for June 7, 2022, and then delayed again until July 22,

---

[3] For instance, even without deposing any involved KSP officer, Hurd could have identified a possible conflict of interest between Sturgill's direct involvement in the events in question (as reflected in the Uniform Citation) and Sturgill authoring two reports about the events (the Response to Resistance Report and Memorandum to Internal Affairs).

2022.  [*Id.*]; [R. 31].  After taking Adams' deposition and hearing his new and shocking allegations against Sturgill, Hurd was idle for over a month before filing the instant Motion to Amend.  *See* [R. 39].  Finally, when Hurd moved to amend the Complaint—obviously aware that the statute of limitations was at issue—he submitted a Proposed Amended Complaint along with a three-sentence motion.  In his Reply, Hurd stated that the documents he obtained through discovery "created the narrative that Wade Adams was the only officer to have a meaningful interaction with Hurd and that Hurd's injuries derived from either the car wreck or a fall over an embankment." [R. 43 at pg. 2].  This does not justify his failure to investigate other officers' involvement, especially when Hurd specifically named "Unknown Defendant[s]"—other KSP officers—as defendants in this action.

All things considered, while Sturgill may have very well acted affirmatively to conceal his involvement, Hurd has not met his burden to demonstrate that he was at the very least diligent in investigating his claims.  Tolling under Kentucky's fraudulent concealment statute requires a showing that he could not have discovered Sturgill's involvement until *after* the statute of limitation expired.  He must also show that he reasonably relied upon Sturgill's misrepresentations and that he failed to timely sue *because* of such representations.  *Wynn v. City of Covington*, No. 21-137-DLB-CJS, 2022 U.S. Dist. LEXIS 169486, at *13 (E.D. Ky. Sep. 20, 2022).  Absent a showing of reasonable diligence, the Court may not apply Ky Rev. Stat. § 413.190(2) to toll Hurd's limitation period for the claims against Sturgill.  Accordingly, such claims are barred by the statute of limitations prescribed by Ky. Rev. Stat. § 413.140(1)(a).

**B. Relation Back Doctrine**

Even when an amendment is barred by the statute of limitations, a movant may still amend his complaint if he can show that the proposed amendment relates back to the original Complaint. Here, only Adams' Response references the applicability of Rule 15, but the Court will address

the issue of the relation back doctrine out of an abundance of caution. *See Bradford*, 767 F. Supp. 2d at 747 (analyzing whether plaintiffs' new claims relate back to the original complaint under Fed. R. Civ. 15(c)(1)(C) although "the parties d[id] not directly address" whether the rule applies).

At the outset, the Court notes that, "[w]hile the relevant state law, here Kentucky, provides the statute of limitations" for Hurd's proposed § 1983 claims, "Fed. R. Civ. P. 15(c) provides the procedure for relation back.'" *Id.* (quoting *DeLong v. Arms*, 251 F.R.D. 253, 256 (E.D. Ky. 2008)). Under Rule 15(c), an amendment to a pleading relates back to the date of the original pleading when:

> (1) the claims arose out of the same conduct, transaction, or occurrence set forth in the original pleading;
>
> (2) the [defendant] to be added received such notice of the claim within 120 days of the filing of the original complaint . . . that they would not be prejudiced in defending the suit; and
>
> (3) within 120 days of the filing of the original pleading, the added [defendant] knew or should have known that the action would have been brought against them but for [plaintiff's] mistake concerning the identity of the proper party.

*Bradford*, 767 F. Supp. 2d at 748 (citing *Black-Hosang v. Ohio Dep't of Pub. Safety*, 96 F. App'x 372, 374–75 (6th Cir. 2004)).

Critically, the second requirement for relation back, enshrined under Fed. R. Civ. P. 15(c)(1)(B), "allows relation back of an amendment asserting a 'claim or defense,' but it does not authorize the relation back of an amendment adding a new party." *Robinson v. Butler Cty.*, No. 4:18-CV-00172-JHM-HBB, 2020 U.S. Dist. LEXIS 236420, at *10 (W.D. Ky. Dec. 16, 2020) (quoting *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010)). The rule allows a plaintiff "to correct a misnomer or effect the substitution of defendants[,]" but it does not allow plaintiffs to "name an additional defendant whose identity is discovered after the statute of limitation expired." *Robinson*, 2020 U.S. Dist. LEXIS 236420, at *11 (collecting cases); *see also Moore v. Tenn.*, 267 F. App'x 450, 455 (6th Cir. 2008) ("[A] plaintiff's lack of knowledge

pertaining to an intended defendant's identify does not constitute a 'mistake concerning the party's identity' within the meaning of Rule 15(c).").  Moreover, a plaintiff may not use a "placeholder" party to preserve claims against defendants whose identities have not yet been discovered. *Robinson*, 2020 U.S. Dist. LEXIS 236420, at *12 (citing *Smith v. City of Akron*, 476 F. App'x. 67, 69 (6th Cir. 2012)).

Here, Hurd avers that Rule 15 does not apply to his motion because "he is not requesting a *change* in parties[,]" and that Rule 15(c) would only apply to the extent that he would allege that Sturgill, not Adams, assaulted Hurd.  [R. 43 at pg. 2] (emphasis added).  Instead, he merely seeks to *add* Sturgill as a party using Federal Rule of Civil Procedure 21.

Hurd's distinction and reliance on Rule 21 are misguided.  First, although Rule 21 provides that the court "may at any time, on just terms, add or drop a party[,]" Fed. R. Civ. P. 21, Hurd does not provide any authority which states that Rule 21 may be utilized to add otherwise time-barred claims.  Courts in this circuit suggest that, when a plaintiff asserts claims against a defendant for which the statute of limitations has already expired, the Court may use Rule 21 to *sever* the defendant against whom the untimely claims are asserted to remedy misjoinder.  *See e.g.*, *Ahmed Hamdan Alkhub v. Louisville Cty. Jail*, No. 3:19-CV-101-GNS, 2019 U.S. Dist. LEXIS 181598, at *3 (W.D. Ky. Oct. 21, 2019); *Diemond v. Mich. Dep't of Corr.*, No. 1:17-cv-928, 2018 U.S. Dist. LEXIS 35169, at *10-11 (W.D. Mich. Mar. 5, 2018); *White v. Jindal*, No. 13-CV-15073, 2014 U.S. Dist. LEXIS 86515, at *31–32 (E.D. Mich. May 7, 2014).

Second, Hurd's proposed amendment procedurally does one of two things: it either seeks to (1) add a new party (Sturgill) and new claims, or (2) substitute "Unknown Defendants" with Sturgill and add new claims.  The former would be barred because Rule 15(c) disallows adding a new party, while the latter would be barred because substituting a named defendant for a placeholder party constitutes a change of parties disallowed by Rule 15(c).  *McCrystal v. Ky. State*

*Police*, Civil Action No. 6: 07-434-DCR, 2008 U.S. Dist. LEXIS 76830, at *8 (E.D. Ky. Sep. 30, 2008) (citing *Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996); *Force v. City of Memphis*, 101 F.3d 702 (6th Cir. 1996) (Table; text at 1996 U.S. App. LEXIS 30233, 1996 WL 665609)) ("[T]he substitution of a named defendant in place of a previously unknown defendant is considered a change of parties and not a mere substitution."). As Rule 15(c)(1)(B) prohibits Hurd from adding Sturgill as a party or substituting him for "Unknown Defendants," the Proposed Amended Complaint does not relate back under Federal Rule 15(c).

For the above-stated reasons, the Court will deny Hurd's Motion to Amend. Derrick Sturgill shall not be added as a defendant in this action.

## IV. MOTION FOR SUMMARY JUDGMENT

Next, Adams moves for summary judgment in his favor and for the Court to dismiss the federal and state law claims against him. To recap, Hurd alleges that Adams (1) used excessive force in violation of the Fourth Amendment, and thus seeks relief under 42 U.S.C. § 1983; and (2) committed several Kentucky common law torts, including false imprisonment, malicious prosecution, and defamation *per se*.

### A. Summary Judgment Standard

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Such a motion then "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted). This is because "[o]ne of the principal purposes of the summary

judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–24.

To avoid summary judgment, the non-movant must come forward with evidence on which a jury could reasonably find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The following factors bear consideration by a court when entertaining a motion for summary judgment:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.,* the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there

is some metaphysical doubt as to the material facts."  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

**B. 42 U.S.C. § 1983 Excessive Force Claim**

Title 42 U.S.C. § 1983 provides that any "person who, under color of any statute . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law."  Thus, to make a claim under § 1983, a plaintiff must show: "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law."  *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014).

Adams admits he was acting under color of state law at the time of the events underlying this action.  [R. 46-1 at pg. 7 n.3].  Further, Hurd alleges that Adams violated his Fourth Amendment rights.  Generally, "[w]hen a free citizen claims that a government actor used excessive force during the process of an arrest, seizure, or investigatory stop, [courts] perform a Fourth Amendment inquiry into what was objectively 'reasonable' under the circumstances."  *Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015).  The Supreme Court in *Graham* "set[] out a three-factor test to aid courts in assessing objective reasonableness." *Graves v. Malone*, 810 F. App'x 414, 421 (6th Cir. 2020) (citing *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).  "Those factors are: (1) 'the severity of the crime at issue,' (2) 'whether the suspect poses an immediate threat to the safety of the officers or others,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham*, 490 U.S. at 396–97).

However, here, Adams claims he is entitled to qualified immunity from Hurd's § 1983 claim.  [R. 46-1 at pg. 2].  Qualified immunity is a doctrine that "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  Thus, the Court engages in a two-part inquiry. First, the Court determines whether the facts "show the official's conduct violated a constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  Second, the Court examines "whether the right was clearly established" at the time of the violation.  *Id.*  If the answer to either inquiry is "no," the official is immune from suit. Importantly, when a defendant asserts that he is entitled to qualified immunity, the plaintiff bears the burden to demonstrate that the defendant is not so entitled.  *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006).

Hurd alleges that Adams exercised excessive force in violation of his Fourth Amendment right to be free from unreasonable searches and seizures.  [R. 1-1 at ¶ 26].  At the time of the alleged constitutional violation, Hurd was a free citizen, meaning that the officer's alleged conduct must be analyzed for objective reasonableness.  *Graham*, 490 U.S. at 388.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 1872 (citing *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S. Ct. 1868, 1879 (1968)).  The inquiry is whether Adams' actions were objectively reasonable "in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."  *Id.*

Crucial here, "[w]here 'a plaintiff claims that excessive force was used multiple times, the court must segment the incident into its constituent parts and consider the officer's entitlement to

qualified immunity at each step along the way.'" *Palma v. Johns*, 27 F.4th 419, 429 (6th Cir. 2022) (quoting *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020)) (internal quotation marks omitted).  Hurd's Response construes his interactions with Adams as three separate episodes of excessive force:[4]  (1) Adams breaking the passenger side window and striking Hurd in the head; (2) Adams pulling Hurd out of the window, tumbling down the embankment, and Adams administering multiple strikes to Hurd's back; and (3) Hurd being kicked in the face and body after he was handcuffed.

*1. Adams' Breaking into Vehicle*

The initial episode that the Court shall analyze is the short period of time between Adams approaching the vehicle and breaking into the passenger-side window.  Hurd alleges that Adams hit him multiple times in the head after breaking out the passenger-side window.

Whether Adams used excessive force in violation of the Fourth Amendment is objective reasonableness.  "[D]etermining the objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Plumhoff v. Rickard*, 572 U.S. 765, 774, 134 S. Ct. 2012, 2020 (2014) (quoting *Graham*, 490 U. S. at 396).  Courts allow police officers leeway "to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  Relevant considerations include the severity of the alleged crime, whether the suspect is an immediate threat to the safety of officers

---

[4] In his Complaint, Hurd alleges that Adams used excessive force when he "busted the passenger side window [and] shatter[ed] glass" onto Hurd and then "dragged [Hurd] through the door, over the broken glass, and proceeded to strike [Hurd] in the head and back numerous times." [R. 1-1 at ¶¶ 17–18].  Hurd further alleges that Adams used excessive force while he was not resisting arrest or carrying a weapon, and without allowing him to comply with police instructions.  [*Id.* at ¶¶ 19, 22–23].  His response divides the alleged facts into three separate episodes of excessive force, rather than one continuous sequence.

or the public, or whether he is "actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Taking Hurd's version of events as true, it is clear from the record that Hurd was an unwilling passenger in a high-speed car chase. His testimony indicates that he repeatedly told Oliver to let him out of the vehicle and that he was afraid of what Oliver could do. [R. 47-1 at pg. 14]. But there was no way for officers in pursuit of the vehicle to know that. Officers were only able to observe what the vehicle was doing during the pursuit. Hurd testified that Oliver ran the car off the road, into someone's yard, and struck "several things" during the chase. [*Id.*]. Then, after police performed the PIT maneuver, he recalls that the windows were busted out and he was hit in the head with something two or three times. [*Id.* at pg. 15]. The strikes to his head, according to Hurd, were in quick succession and "pretty hard." [*Id.*]. Hurd offers photographic evidence which clearly shows he suffered a head injury, but the record is generally bereft of medical evidence which establishes the cause of the head injury. [R. 47-7, 47-8, 47-9, 47-10, 47-11, & 47-12].[5] But none of the other officers present at the scene witnessed whether Adams struck Ricky in the head. *See e.g.*, [R. 47-3 at pg. 5] (Detective Scott Caudill only observed Adams pulling Hurd from passenger window); [R. 47-4 at pg. 4] (Trooper Bobby Roberts arrived on the scene after Hurd was removed from the vehicle and was laying on the ground); [R. 47-5 at pg. 6–7] (Sergeant Derrick Sturgill only observed Adams after Hurd was removed from the vehicle).

While Adams contends that he never struck Hurd in the head,[6] [R. 47-2 at pg. 9], the Court

---

[5] As part of Sergeant Sturgill's use of force investigation, he interviewed the emergency room physician who treated Hurd, Dr. Darrell Palladino. [R. 43-2 at pg. 9]. According to Sturgill's summary of the interview:

> Doctor Palladino described [Hurd's] injuries as "very consistent with a motor vehicle accident". He said a fractured orbital was consistent with a blow from the inside compartment of the vehicle when the vehicle drove off the roadway and struck another object. Doctor Palladino said the injuries were consistent with injuries he had treated over the last thirty years and the signs, symptoms and x-rays were consistent with a motor vehicle collision.

[*Id.*].

[6] Rather, says that he used his flashlight to bust out the passenger-side windows because he could not see into the car. [*Id.* at pg. 7]. When he busted out the window, and saw Hurd in the front passenger seat, he stopped hitting the

concludes that even if he did, the force used would not have been excessive in violation of the Fourth Amendment. This was a high-speed chase which required the intervention of multiple KSP troopers to bring the vehicle to a stop. Adams himself deployed spike strips and saw the vehicle keep going after its tires were blown. The vehicle was only stopped after Trooper Daniels performed a PIT maneuver and forced the vehicle to crash. A reasonable officer would have expected the vehicle's occupants to be fleeing from police for a reason. The vehicle's dangerous maneuvering would lead a reasonable officer to believe the vehicle's occupants were just as dangerous. And, clearly, the pursuit was a *de facto* attempt to evade police. On this alone, Adams was justified in applying the force necessary to secure the vehicle's occupants. Moreover, when he arrived on the scene, Adams witnessed multiple officers struggling to subdue the driver. Meanwhile, he heard Sergeant Sturgill "screaming, 'tase him.'" [R. 47-2 at pg. 8].

The excessive force claim here is like that alleged by the plaintiff in an Eastern District of Michigan case, who was "struck in the back of the head with a flashlight, choked, and kneed in the back" by deputies attempting to subdue him during a vehicle stop. *Dixon v. Roscommon Cty.*, No. 09-14236-BC, 2011 U.S. Dist. LEXIS 6856, at *17 (E.D. Mich. Jan. 25, 2011). There, the court observed that the plaintiff was under the influence of narcotics and acting erratically but was not attempting to escape and was not forcibly resisting officers. *Id.* at *19–20. Yet, the court acknowledged that some use of force was objectively reasonable to apprehend the plaintiff because he was refusing to exit the vehicle and was suspected to be driving under the influence and without a driver's license. *Id.* at *20. Thus, the court found that the force used to extract the plaintiff from the vehicle (initial blows to the head and forcible removal) were objectively reasonable, whereas the "gratuitous violence" which followed the plaintiff's extraction was objectively unreasonable

---

window. [*Id.* at pg. 8]. At the time, Adams could not tell if Hurd had been injured or if he was "knocked out." [*Id.*].

and constituted objective force.  *Id.* at *21–22.

Assuming Hurd's version of events is true, if Adams applied three quick strikes to the head to subdue an individual whom he reasonably believed was a danger to himself and other officers, the Court concludes that such conduct would not amount to excessive force proscribed by the Fourth Amendment.  Thus, the Court need not reach the factual issue of whether Adams actually used such force.  Adams is therefore entitled to qualified immunity as a matter of law as to the first alleged episode of excessive force.  The Court will likewise grant summary judgment solely as to the first episode.

### 2. Hurd's Extraction from Vehicle and Handcuffing

The next segment of the Court's excessive force analysis is the episode in which Adams removed Hurd from the vehicle—from the time Adams ordered Hurd, and their fall over the embankment, to Adams handcuffing Hurd.  After weighing the *Graham* factors, the Court concludes that Adams was objectively reasonable and did not violate the Fourth Amendment, thus entitling him to qualified immunity and summary judgment as to the second episode of alleged use of excessive force.

Instructive here is *Dunn v. Matatall*, where Sixth Circuit found that officers acted reasonably when they physically removed the plaintiff from his vehicle after leading police on a high-speed chase that lasted approximately two minutes.  *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008).  As a result of the encounter, the plaintiff fractured his femur, which required surgery and physical therapy.  The court considered (1) the severity of the crime, that the plaintiff "committed more than a 'mere traffic offense[,]'" *id.*; (2) the threat to safety, that the officers had no way of knowing the danger posed by the driver, only that he "had driven recklessly, and appear recalcitrant in complying with the Officers' commands to exit his vehicle[,]"  *id.*; and (3) the plaintiff's level of resistance, specifically that "only seconds elapsed" between the plaintiff

unfastening his seatbelt and officers pulling the plaintiff out of the car, *Id.* 355. Considering the factors, the court reasoned that the "heightened suspicion and danger" following the car chase made the forcible removal of the plaintiff from the vehicle objectively reasonable. *Id.*

Another Sixth Circuit case dealt with the forcible removal of a plaintiff—this time a passenger—from a vehicle following a high-speed chase, where the court noted that the chase was "far more dangerous than that in *Dunn.*" *Estate of Brackens v. Louisville Jefferson Cty. Metro Gov't*, 680 F. App'x 362, 367 (6th Cir. 2017). By contrast, Jeffersonville, Indiana police attempted to conduct a traffic stop on the vehicle, after discovering the vehicle's owner (and driver) had outstanding warrants. The traffic stop went bad when the police officer asked the driver to step out of the vehicle, and she instead decided to speed off. The driver performed dangerous maneuvers, such as entering the highway in the wrong direction and driving at speeds exceeding 90 miles per hour. *Id.* at 364. She also drove across a median at one point in an attempt to ram a police cruiser.

The chase lasted about 20 minutes. Notably, in *Estate of Brackens*, the passenger called the police from inside the vehicle to communicate that he was being held against his will—but, in an unfortunate miscommunication, dispatch informed officers that the female occupant (the driver) was not involved, while the male occupant (plaintiff passenger) was "suicidal or homicidal" and dangerous. *Id.* at 367. Still yet, the court found that the officers were objectively reasonable under these circumstances because—based on what was known to them at the time, and not hindsight—they perceived the passenger to be a potential threat. Accordingly, the court held that the officers did not use excessive force when they pulled the plaintiff out of the car, dragged him to the ground, and restrained him with a knee to his head. *Id.*

In this case, Hurd alleges that Adams used excessive force when he "plucked" Hurd through the window, rolled down an embankment, and then struck him in the back. [R. 47 at pg.

4–5].   As in the above cases, Adams' use of force was objectively reasonable under the circumstances.   Adams arrived on the scene after another police officer disabled a vehicle, driven by a known and dangerous suspect, after a high-speed chase that spanned across Knott and Perry counties.   [R. 47-2 at pg. 4].   His sergeant authorized him to throw spike strips on the road to disable the vehicle, and the vehicle kept going after its tires blew out.   [*Id.*].   He was also aware that the vehicle had made extremely dangerous maneuvers that endangered the lives of not only police officers, but of civilian motorists.   After Trooper Daniels performed the PIT maneuver and finally disabled the vehicle, Adams approached the vehicle and heard a loud popping noise that he thought could have been a gunshot.   [*Id.*].   The other troopers were struggling to subdue Oliver, who appeared to not be complying with their orders.

Adams had every reason to believe that the vehicle's occupants posed a danger, and no reason to believe the passenger, Hurd, was essentially held hostage to the high-speed police chase. *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604, 609 (6th Cir. 2020) (citing *Graham*, 490 U.S. at 396) (pointing out that the perspective of a reasonable officer on the scene is limited to information that is known at the time).   Based on these facts, Adams was objectively reasonable when he forcibly removed Hurd from the vehicle, even if Adams only allowed Hurd a few seconds to comply with his commands.   Just as in *Dunn*, a reasonable officer in Adams' circumstances would have perceived the vehicle's occupants to be dangerous, such that swiftly securing the occupants was a priority.

Neither party contends that Adams intentionally threw Hurd down the embankment as an attempt to subdue him.   By all accounts, the fall seems accidental.   Moreover, accepting his version of events as true, Hurd's perfunctory testimony that "I remember being hit multiple times and then cuffed" does not contradict Adam's claim that he administered two closed fist "compliance strikes" to get Hurd's hands free so he could handcuff him.   *Compare* [R. 47-1 at pg. 5] *and* [R.43-2 at pg.

37].  Adams' testimony, uncontradicted by Hurd's testimony, indicates that the "use of force was brief and was used only to bring a non-compliant [Hurd] under control."  *Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010).

Adams' conduct does not resemble the officers' conduct in *Meadows v. City of Walker*, which Hurd cites in his Response.  There, one officer threw the plaintiff to the ground after he voluntarily exited the car after a high-speed chase.  *Meadows v. City of Walker*, 46 F.4th 416, 419 (6th Cir. 2022).  Another officer helped him subdue the plaintiff, pinning his right arm between his body and the ground.  *Id.*  The first officer told the plaintiff to roll over and "kneed[ed]" him in the back.  *Id.*  The assisting officer struck the plaintiff in the shoulder or head, and then two times more on his side.  *Id.*  Ultimately, the Sixth Circuit found that the officers used excessive force because they took down the plaintiff and beat him while he was not actively resisting arrest. Again, in that case, the plaintiff complied with the officer's commands to exit the car before excessive force was used.

Adams met his burden to show that there is no dispute of material fact as to whether he used excessive force, and Hurd has not presented affirmative evidence that excessive force was used in this instance.  *Dunn* supports Adams' assertion that he acted reasonably when he acted within seconds to subdue Hurd in light of the heightened perception of danger, and the record overwhelmingly supports Adams' assertion that he only struck Hurd in the back twice to handcuff him.  This was nowhere near the beating in *Meadows* and, apparently, even less force than applied by officers in *Dunn* or *Estate of Brackens*.  Viewing the facts in the light most favorable to Hurd, no Fourth Amendment violation occurred as to this episode.  Adams is thus entitled to qualified immunity and the Court will grant his motion for summary judgment and find, as a matter of law, that Adams did not use excessive force as to the second episode.

*3. Alleged Assault of Hurd After Handcuffing*

The final episode in which Hurd alleges that Adams used excessive force occurred after he was handcuffed. In his deposition testimony, Hurd vaguely described the type of force he alleges was used after he had already been restrained:

> **Q: Was you ever hit after you were cuffed?**
> A: Yes.
> **Q: By who; do you know?**
> A: It was dark. There was blood all in my eyes. I couldn't see.
>  . . .
> **Q: Do you remember being kicked in the head?**
> A: Yes.
> **Q: What about the side?**
> A: I was kicked in my sides, all the way up my body, in the back, in the head.

[R. 47-1 at pg. 6]. Hurd alleges that the totality of the evidence indicates that Adams was the only officer who interacted with Hurd and, therefore, the only one who could have beaten him after he was handcuffed. [R. 47 at pg. 3].

As a preliminary matter, the Sixth Circuit has consistently found that "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006). All the evidence and testimony in the record indicate that, after he was handcuffed, Hurd was laying on the ground and did not pose a threat to any of the officers. Thus, the alleged use of force after Hurd was handcuffed was excessive as a matter of law.

Adams burden, again, is to show the absence of a genuine dispute of material fact as to whether he used excessive force. He fails to do so. Adams' deposition testimony points to Sturgill as Hurd's assailant. He testified that he believed that Sturgill used "beyond excessive force" on Hurd, constituting a first or second-degree assault. [R. 47-2 at pg. 25]. But the other officers deposed do not corroborate Adams' allegations. Viewing the facts most favorable to the Hurd, the non-movant, there unquestionably remains a genuine dispute of material fact as to whether Adams

used excessive force after Hurd was handcuffed.  The Court is left with two diametrically opposed accounts.  Specifically, there is a genuine dispute as to which KSP officer—if any—assaulted Hurd.  Whether Adams used excessive force is a salient and factual question to be answered by the jury.  Because there is a genuine dispute as to whether Adams used excessive force on Hurd after he was handcuffed, Adams is not entitled to qualified immunity for Hurd's § 1983 claim.  Likewise, Adams is not entitled to summary judgment on his claim.

## C. State Law Claims

Next, the Court turns to whether Adams is entitled to summary judgment as to Hurd's state law claims of false imprisonment, malicious prosecution, and defamation *per se*.  As a preliminary matter, Hurd failed to respond in opposition to Adams' summary judgment motion as to *all* of his state law claims.  Strikingly similar to the circumstances here, the Sixth Circuit held that a plaintiff abandoned her state law claims when she only addressed her federal law claims in response to the defendants' motion for summary judgment.  *Wierengo v. Akal Sec.*, Inc., 580 F. App'x 364, 369 n.1 (6th Cir. 2014).  In several other cases, the Sixth Circuit has consistently determined that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."  *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (affirming district court's refusal to consider claims to which plaintiff did not respond in opposition to a motion for summary judgment).  *see also Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declined to consider the merits of a claim when the plaintiff failed to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim); *Dulaney v. Flex Films (USA), Inc.*, No. 20-6098, 2021 U.S. App. LEXIS 25523, at *15 (6th Cir. Aug. 23, 2021) ("The district court did not err in granting Defendants'

motion for summary judgment . . . when [Plaintiffs] failed to discuss them in their opposition to Defendants' motion for summary judgment.").

Here, Hurd's response fails to make *any* mention of his state law claims. The Court can only conclude that Hurd has abandoned his state law claims. Thus, consistent with circuit practice, the Court shall grant Adams' motion for summary judgment as to Hurd's claims of false imprisonment, malicious prosecution, and defamation *per se*.

## V. CONCLUSION

First, Hurd moved to amend his Complaint to add Sergeant Derrick Sturgill. The Court denied the motion, because the amendment is barred by the statute of limitations and the new claim does not relate back to Hurd's original Complaint.

Second, Adams moved for summary judgment on all of Hurd's claims, asserting qualified immunity under federal and state law, and also arguing that there is no genuine dispute of material facts as to the merits of any of Hurd's claims. The Court analyzed each episode of excessive force alleged by Hurd and found that Adams was entitled to qualified immunity as to Hurd's allegation of excessive force with respect to (1) Adams' breaking into the vehicle and striking Hurd in the head; and (2) Adams' extracting Hurd from the vehicle and striking him in the back in order to handcuff him. Thus, Adams is also entitled to summary judgment as to those episodes. But Adams is not entitled to qualified immunity as to Hurd's claim that Adam beat Hurd after he was handcuffed. Nor is he entitled to summary judgment as to that allegation. Whether Adams is liable under § 1983 for his alleged use of excessive force in the third episode of alleged excessive force will be up to the jury.

Third, the Court will also dismiss all of Hurd's state law claims as abandoned, as he did not defend those claims against Adams' summary judgment motion. Having fully considered the matter, and the Court being otherwise sufficiently advised,

IT IS ORDERED that:

(1) Hurd's Motion to Amend the Complaint [R. 39] is DENIED.

(2) Adams' Motion for Summary Judgment [R. 46] is GRANTED in part and DENIED in part, as follows:

    a.  As a matter of law, Adams did not use excessive force in violation of the Fourth Amendment when he allegedly broke the window to the vehicle and struck Hurd in the head.  Thus, Hurd's § 1983 claim as to this limited instance is DISMISSED with prejudice, as consistent with this opinion.

    b.  As a matter of law, Adams did not use excessive force in violation of the Fourth Amendment when he extracted Hurd from the vehicle and handcuffed him. Thus, Hurd's § 1983 claim as to this limited instance is DISMISSED with prejudice, as consistent with this opinion.

    c.  Adams' motion for summary judgment as to the remainder of Hurds' allegations that Adams used excessive force in violation of the Fourth Amendment is DENIED, as consistent with this opinion.

    d.  Adams' motion for summary judgment is GRANTED as to all of Hurd's state law claims against Adams, and the claims set forth in Counts I–III of the Complaint are DISMISSED with prejudice.

(3) The parties are DIRECTED to file separate Status Reports, indicating trial readiness and availability for trial on or before Monday, July 17, 2023.

Signed June 30, 2023.



Signed By:

*__Edward B. Atkins__*   *ЄβA*

**United States Magistrate Judge**